HICKS v. HIATT, Warden, et al.

No. 187.

District Court, M. D.. Pennsylvania.

Jan. 15, 1946.

Edward W. Warren and John M. Mc-Court (of O'Malley, Harris, Harris & Warren), both of Scranton, Pa., for petitioner.

Frederick V. Follmer, of Scranton, Pa., U. S. Atty., and Herman F. Reich, of Lewisburg, Pa., Asst. U. S. Atty., for respondent William H. Hiatt.

BIGGS, Circuit Judge.

The petitioner, Donald Hicks, formerly a private in the United States Army presently confined in the United States Penitentiary at Lewisburg, Pa., was convicted of rape by a court-martial at Corby,[1] England, and was sentenced to a term of twenty-five years. He asserts that he was denied due process of law by the military authorities before and during the course

[1] The Allied Forces Act, 3 & 4 Geo. 6c.51, provides inter alia, courts and authorities of any Power allied or associated with Great Britain may exercise " * * * all such powers as are conferred upon them by the law of that Power * * * ". See 28 A.B.A.J. 762–765. Hicks was a private in the 401st Bombardment Group, 8th Air Force, A. A.F. His trial purportedly was con-

of his trial and seeks release by writ of habeas corpus.

From the evidence given at the court-martial it appears that Hicks met the complaining witness in the court-martial proceedings, Mrs. Murray, and her husband at the White Horse Public House at Corby, England, on Christmas night, 1943. Mrs. Murray testified that this was her first meeting with the petitioner though she stated that she had seen him in the public house nine days earlier. Hicks testified that the meeting on Christmas night was not his first with Mrs. Murray and that he had sexual intercourse with her with her consent twice previously. On December 26 at 10:20 p.m., Mr. Murray being absent at work, Hicks came to the Murray home in Sarrington Close in Corby, knocked at the back door and was admitted. He testified that he came to the Murray home at that hour because he had made an assignation with Mrs. Murray the preceding evening. He brought with him a piece of cake and some tea in a paper bag. Shortly thereafter, according to Mrs. Murray's testimony, Hicks raped her.

Mrs. Murray's testimony as to how the rape was committed is set out in the record and need not be repeated here. She testified in effect that Hicks consummated his purpose in such a fashion that she was unable to defend herself or effectually to call for help.

Hicks for his part admitted that he had had sexual intercourse with Mrs. Murray but insisted that it was with her consent and conditioned on an agreement that he would give her a specified sum of money, that upon his refusal to complete his bargain she became "quite perturbed" and, running to a neighbor's residence in Sarrington Close, alleged that he had committed the crime with which he was charged.[2]

No exact description of this Close is available from the record but it is clear that the house occupied by the Murrays was a "row" dwelling, partitioned from two adjacent homes by common walls. The home immediately to the south of the Murray's dwelling was occupied by Mr. and Mrs. Smedley. The home to the north was occupied by Mr. and Mrs. Smith. These neighbors testified that frequently through the walls of their dwellings they had heard Mrs. Murray talking to or yelling at her children and the sound of her radio. They testified also that they had heard no unusual sounds or any outcry from Mrs. Murray at the time when she testified she was being ravished.

Jones, a police constable, testified at the court-martial over objections of Hicks' counsel, that the wall between the Murray and the Smith homes consisted of 4½ inches of brick with ¾ inches of plaster on each side, a total of 6 inches and that the partition between the Smedley and Murray homes consisted of 9 inches of brick with ¾ inches of plaster on each side, a total of 10½ inches.

Across the Close at a distance of about 45 feet was a dwelling occupied by the Green family. When the events complained of had been consummated Mrs. Murray locked the kitchen door on the outside, taking the key with her, crossed the Close to the Green's home and informed Mr. and Mrs. Green that she had been raped by Hicks. Both Mr. and Mrs. Green then accompanied Mrs. Murray to her home and found Hicks standing between the dining room and scullery. Both Mr. and Mrs. Green testified at the trial as to what Mrs. Murray and Hicks said or did when they met on this occasion and as to Mrs. Murray's appearance and state of mind. This evidence was damaging to Hicks.

Errors in Procedure Before Trial.

(1) Hicks was arrested on December 27 and interrogated at the Corby Police Sta-

---

ducted according to the Articles of War as enacted by Congress. The substantive law of England relating to the crime of rape is similar to that of the United States. See 52 Corpus Juris, Rape, page 1079, and English & Empire Digest, vol. 14, pp. 364, 365. Consequently no substantial question of conflict of laws arises. 2 Bouv. Law Dict., Rawle's Third Revision, p. 2805, defines the crime of rape for both English and American courts. The definition is as follows: "The carnal knowledge of a woman by a man forcibly and unlawfully against her will."

[2] It appears that Mrs. Murray weighed about ninety-five pounds. Hicks is a man of normal height and physical development. He weighs about 155 pounds. Throughout the occurrence Mrs. Murray had her shoes off and Hicks kept his glasses on. The complaining witness had three fresh scratches on her arms and body and both she and her husband testified that she had bruises on her body. There is no evidence that Hicks bore on his body or face visible signs of an injury or of a struggle.

tion by Corporal John P. Strayel[3] of the military police in the presence of certain persons who need not be named herein. Strayel failed to inform Hicks of "his right to make or submit a statement in any form subject to the risk of having such statement used against him". See Instructions, Paragraph 35.a. of the Manual for Courts-Martial, United States Army. Strayel did more than this, however. He induced Hicks to make a statement by informing him that such information as Hicks would give him would be utilized on his, Hicks', behalf.[4] Strayel asked Hicks where he had spent the balance of the night of December 26–27. Hicks replied that he had spent it at the Deenthorpe Airfield where he was stationed, at a barracks other than his own. This statement was false and was employed by the prosecution at Hicks' trial with serious consequences for the petitioner as will be pointed out hereinafter.

■ (2) Article 70 of the Articles of War, 10 U.S.C.A. § 1542, and Paragraph 35.a. of the Manual for Courts-Martial both provide that the investigating officer shall examine available witnesses requested by the accused.[5] The major issue presented at the trial was whether or not Mrs. Murray had consented to intercourse with Hicks.[6] Hicks' offense was being investigated by Captain Davison. Hicks informed Davison that three other enlisted men, Manas, Calderone and Driscoll, had seen him with Mrs. Murray on occasions previous to the night of December 26 "under questionable circumstances" and requested Davison to examine them. Davison interviewed these three men. All stated they had seen Hicks with a woman of Mrs. Murray's general description at about the times Hicks indicated. The "Summary[7] of Report of the Investigating Officer's Findings" states in part that meetings were arranged at Mrs. Murray's home "where unknown to her" Manas and Calderone were enabled to see her and that both stated that Mrs. Murray was not the woman whom they had described as being with Hicks. The summary goes on to state, however, "In the light of these developments, and due to the fact that Mrs. Murray had been repeatedly subjected to these meetings, this Officer believed it impractical to have witness Driscoll see her also." The meaning of the sentence quoted from the report is not clear to the present writer but it is apparent that the investigating officer in failing to let Driscoll view Mrs. Murray, did not examine him in any respect which might have aided Hicks' defense. The provisions of Article 70 and of Paragraph 35.a. of the Courts-Martial Manual required him to do so. For the purposes of the instant case it must be assumed that Driscoll's testimony would have tended to corroborate Hicks' statements as to his prior carnal knowledge of Mrs. Murray and therefore would have affected her credibility. See note 9, infra.

■ (3) Article 70 and Paragraph 35.a. of the Manual for Courts-Martial provide that during the investigation of a charge "* * * full opportunity shall be given to the accused to cross-examine witnesses against him if they are available * * *." These provisions are mandatory. Hicks was not given the opportunity to cross-examine certain witnesses who appeared and testified against him at his trial. Such witnesses whose testimony was damaging to Hicks included Mr. and Mrs. Green, Dr. John Irving, Bernard Murray, the husband of the complaining witness, and Police Constable Jones.

(4) Article 70 provides "No charge will be referred for trial until after a thorough and impartial investigation thereof shall

---

[3] This name is spelled in various ways throughout the court-martial records.

[4] Strayel testified at the court-martial in respect to his interrogation of Hicks on this occasion as follows: "I would say that I had when I first talked to him [Hicks], told him that we were conducting an investigation and that if he could give us information we might, and could, it was in our power, both the police here in Corby and us to utilize the information on his behalf if possible." "I tried to explain to him that I wasn't there to try him. I was there to investigate the case and that what information he could give me could be utilized on his behalf."

Hicks testified that Strayel told him that anything he, Hicks, told Strayel would be "hearsay" and could not be used in a criminal proceeding.

[5] The words of Article 70 and of Section 35.a. of the Courts-Martial Manual are identical, viz., "* * * the investigating officer shall examine available witnesses requested by the accused."

[6] No substantial question of conflict of laws is presented by the case at bar.

[7] The report itself is not part of the record.

have been made." Paragraph 35.a. of the Courts-Martial Manual has a substantially similar provision. The investigating officer's [Captain Davison's] summary states under the heading "(5)" that "Complainant's [Mrs. Murray's] reputation for morality is not good in her community." I conclude from this statement that the investigating officer had determined, from statements which had been made to him by persons living in Corby, that Mrs. Murray's reputation in her community was that of an unchaste woman. This view is confirmed by further language of the summary which asserts that there were "mitigating circumstances" to Hicks' misconduct. The summary goes on to say, "This statement [as to existing mitigating circumstances] is based solely upon the purely hearsay statements of Mrs. Murray's neighbors and other residents of Corby who, although they will not or cannot bring forward specific evidence to substantiate their beliefs, insist that from her past conduct, Mrs. Murray is not a good and virtuous woman." The summary states also that Thomas Murray,[8] the manager at the Raven Dance Hall stated to the investigating officer, "I know she [Mrs. Murray] has a reputation for being a 'hot number'. She's a 'tough number'."

█ The investigating officer was apparently unaware that the character, i.e., the reputation, of a rape-complainant as to chastity in the community in which she lives is of substantial probative value in judging the likelihood of her consent and that proof of specific instances of misconduct with any other person than the accused might be inadmissible.[9] Despite the fact that evidence as to Mrs. Murray's reputation was at hand the investigating officer paid but little attention to it in his summary. Moreover, he stated, "* * *

the charge of rape is correct in the instant case" but went on to say that although Hicks "* * * may have resorted to force * * * was there in fact want of consent? This Officer, is of the opinion that the answer should be in the negative."

█ I am forced to the conclusion that the investigation of the charge was not "thorough" in that it was not made competently.

Errors in the Court-Martial Proceedings.

█ (1) Under "Errors in Procedure before Trial (1)" reference was made in this opinion to Hicks' false statement that he had spent the balance of the night of December 26-27 at the airfield at a barracks other than his own and it was said that he was induced to make this statement by Corporal Strayel's suggestion that such information as Hicks gave would be utilized in Hicks' favor. At the court-martial Hicks took the witness-stand in his own defense. Upon cross-examination he was compelled to admit that he had lied to Strayel and had in fact spent the balance of the night at the home of another married woman. These admissions tended to incriminate and degrade the petitioner in violation of Article 24 of the Articles of War, 10 U.S.C.A. § 1495, and of Paragraph 122.a. of the Courts-Martial Manual. On cross-examination and over the objections of Hicks' counsel the trial judge advocate repeatedly interrogated the petitioner on the irrelevant question as to where he had spent the balance of the night of December 26–27. There was no assertion that the petitioner had been a fugitive from justice. The inquiry was unrelated to the issue of the petitioner's guilt or innocence of the crime with which he was charged and was contrary also to the provisions of Paragraph 121.b.[10] of the Courts-Martial

---

[8] Apparently not connected by blood or affiliation with the complaining witness or her husband.

[9] See Wigmore on Evidence, 3rd Ed., § 62, and the English and American authorities cited in the note to that section.

See also Chamberlayne Trial Evidence (Tompkins), pp. 598, 599, as follows:

"In common law rape the character and habits of the complainant which go to show want of chastity, are admissible, from which flow strong inferences that she consented. In showing this the important question is whether they shall be shown by her general reputation or

by specific acts. Probably the weight of authority is in favor of the rule that they shall be shown by her general reputation for chastity.

But specific acts with the accused had before that of which the accused is charged are held admissible to show consent even in these jurisdictions. Certain substantial jurisdictions allow specific acts had with others to be proved for this purpose. This evidence must be confined to acts which preceded the particular offenses charged."

[10] "An accused person taking the stand as a witness becomes subject to cross-examination like any other witness.

Manual. Strayel, the first witness called by the trial judge advocate in rebuttal, testified further as to Hicks' lie and the falsity of his statement apparently was urged [11] upon the court-martial by the trial judge advocate in summing up. This was prejudicial to the petitioner and constituted reversible error.

■ (2) Corporal Emanuel Miller also testified in rebuttal. He had been employed as a clerk in the office of Captain Davison and had been present at certain of the pre-trial examinations of Hicks by Captain Davison and others. Miller's testimony was pure hearsay and completely inadmissible. What he testified to was largely irrelevant but he made it clear that Hicks was an evasive and reluctant witness at the pre-trial investigations.[12] But Hicks, as has been stated, was not compelled to incriminate himself or to respond to any question the answer to which would have tended to incriminate him. See Article 24 of the Articles of War which provides in substance that no person shall be compelled to be a witness against himself. Here again was prejudicial error which should have compelled the reviewing authorities to have granted the petitioner a new trial.

■ (3) No evidence was adduced at the court-martial to show the reputation of Mrs. Murray for chastity in the community in which she lived. Indeed the trial judge advocate set his face against the admission of such evidence, a course in which the petitioner's counsel at the trial acquiesced.[13] The court itself under the circumstances of the case at bar should have inquired into the question of Mrs. Murray's reputation for chastity in the community in order that her credibility might be tested. That evidence was available which would have tended to prove her reputation for lack of chastity is indisputable.[14] Such evidence

---

[*] * * When the accused testified in denial or explanation of any offense, the cross-examination may cover the whole subject of his guilt or innocence of that offense. Any fact relevant to the issue of his guilt of such offense or relevant to his credibility as a witness is properly the subject of cross-examination. * * * ''

See also Underhill's Criminal Evidence, 4th Ed. Sec. 140, "Accused as a Witness."

[11] See "Review of Staff Judge Advocate".

[12] Miller testified "that the accused was pretty tight-lipped and didn't seem to be able to, or didn't seem very eager to furnish the facts * * *".

[13] See the cross-examination of Mrs. Olive Smith, p. 77 of the court-martial record. The petitioner's counsel asked: "Do you know Mrs. Murray's general reputation in your community there?" The answer was irrelevant to the issue here presented, viz., "She is not very popular." The trial judge advocate then interposed his objection, "I object to this general reputation." The petitioner's chief counsel then stated to the court: "I think the defense has a perfect right to ask the witness for the general reputation of the complainant in a rape case. However, I will withdraw the question." Emphasis added.

Defense counsel did inquire of both Mr. and Mrs. Norman Smedley whether they knew anything about Mrs. Murray's reputation for chastity in her community. Both replied, "No.". No further question was asked of any witness in respect to this matter.

[14] See the petition for clemency executed by Captain (then Major) Davison in which it is stated in part: "Since the date of the trial, this office has been literally besieged with offers of testimony from residents of Corby, who claimed to be able to prove that Mrs. Murray was a woman of unchaste and low moral character; and that on dates which they would establish, she had cohabited with persons other than her lawful husband in illicit sexual intercourse. (Emphasis added)

"This office felt that in all justice to Private Hicks, and especially in view of the gravity of his sentence, no effort should be spared where it might prove possible to produce positive evidence in his behalf. A tireless attention was devoted to such persons as came forward, but in each instance information volunteered was either hearsay or opinion, and it would be unavailing to recite its substance."

It will be observed that Major Davison fell into the same error in interpreting the law relating to proof of reputation as he had in investigating the offense. See the "Summary" referred to at an earlier point in this opinion. He concluded that reputation or character for unchastity must be proved by specific acts of sexual immorality.

It should be noted also that a large majority of the inhabitants of Corby, a town of about 2,000 persons, petitioned the military authorities for clemency for

should have been received by the court-martial.[15]

(4) The argument of the trial judge advocate in summing-up was not taken down and therefore does not appear in the transcript of the proceedings at the trial. None the less in the "Record of Trial by General Court-Martial"[16] there is a letter from Major Albert E. Barrs, the petitioner's chief counsel. In this letter, addressed to the Commanding General of the Eighth Air Force, Barrs asks clemency for Hicks. In paragraph 1.f., Barrs states, as a reason for clemency, "The prosecution, in its closing argument, particularly stressed the fact that the accused made no sworn statement before trial, which if not a violation of the rights of accused, was at least prejudicial to him. This fact is not believed to be proper subject matter for comment by the Trial Judge Advocate." The *"Review of Staff Judge Advocate"* states: "In their letter requesting clemency, defense counsel allege that the prosecution, in its closing argument, commented upon accused's failure to make a sworn statement before trial. Argument of counsel was not recorded. Upon inquiry, the Trial Judge Advocate states that his comment related to the variance between accused's testimony as a witness that he spent the remainder of the night after the alleged act at the home of another woman, and his unsworn statement before trial that he had returned to his station but had slept in a barracks other than that assigned to him. Major Barrs, defense counsel, has advised the writer that it was this comment to which he referred in his letter. Such reference to conflicting statements of accused was not improper."

■ The statement by Major Barrs as to what was argued to the court-martial by the trial judge advocate is plain and unequivocal. Barrs was present at the trial and the reviewing officer was not.[17]

I accept the statements of fact contained in Barr's letter as correct. As has been stated Hicks was not required to or under obligation to make any statement under oath or otherwise to the interrogating officers. The provisions of the Fifth Amendment and Article 24 of the Articles of War guaranteed him protection from self-incrimination. The comment of the trial judge advocate as to Hicks' failure to make a sworn statement before trial was highly prejudicial to the petitioner and constituted reversible error.

■ (5) The petitioner has testified that he requested his counsel at the court-martial to summon as witnesses three persons who, he insists, would have testified as to Mrs. Murray's reputation for lack of chastity. These persons were Ford D. Fulcher, William McNaboe and Mary Canfield, inhabitants of Corby. The respondent has produced no evidence to controvert Hicks' statement that he made this request and I accept it as correct. Hicks' counsel should have called the persons named as witnesses. The respondent insists, however, that errors, whether of commission or omission, committed by the petitioner's counsel must be attributed to the petitioner, i. e., that he must bear the burden of them. The applicability of this principle under the circumstances of the case at bar is discussed at a later point in this opinion. It is sufficient to state here that even if the error of Hicks' counsel in not calling the persons named as witnesses, may be attributed properly to him this did not relieve the court itself from making inquiry into Mrs. Murray's reputation for chastity in Corby and seeing to it that evidence was offered on this issue.

■ Moreover, it must be assumed that the report of the pretrial investigation was in the hands of the trial judge advocate. I do not imply that that officer was

---

Hicks. See the petition which is a part of the court-martial record.

[15] See Paragraph 75 of the Manual for Courts-Martial which provides in part: "The court is not obliged to content itself with the evidence adduced by the parties. Where such evidence appears to be insufficient for a proper determination of any issue or matter before it, the court may and ordinarily should, take appropriate action with a view to obtaining such available additional evidence as is necessary or advisable for such determination. The court may, for instance, require the

trial judge advocate to recall a witness, to summon new witnesses, or to make investigation or inquiry along certain lines with a view to discovering and producing additional evidence."

[16] As distinguished from the transcript of the proceedings at trial, a part of the court-martial record. The original "Record of Trial by General Court-Martial" was received and marked as "Petitioner's Exhibit" in the instant proceedings.

[17] See the names of the officers who constituted the court-martial as stated in the court-martial record.

246

guilty of conscious suppression of evidence favorable to the accused for I do not believe that to have been the case. The trial judge advocate had the duty, as does any prosecutor, to see that Hicks was dealt with fairly. That duty is recognized by the Manual for Courts-Martial. See Paragraph 41.d.[18] Under the circumstances of the case at bar the conclusion is unavoidable that the trial judge advocate negligently failed to reveal the whole truth to the court-martial. As has been pointed out the trial judge advocate resolutely set his face against and objected to any questions which might have elicited answers pertinent to Mrs. Murray's reputation. This did not result from a desire to pervert the truth. It came about, I believe, because of an imperfect knowledge of the applicable principles of law but the effect on Hicks' defense was as substantial as if the withholding of evidence of the complaining witness's reputation had been conscious.[19]

■■■■ (6) As has been stated, Police Constable Jones testified as to the width of the partitions between the Murray apartment and the apartments of the Smedleys and the Smiths. It must be borne in mind that the question of whether or not Mrs. Murray offered resistance to Hicks' intercourse was the substantial question in the case and that both the Smedleys and the Smiths testified that ordinarily they could hear noises emanating from the Murray apartment. Jones' testimony was offered by the prosecution at the beginning of the court-martial evidently in anticipation of Hicks' probable defense. He testified for example that the partition between the Smedley and the Murray homes consisted of nine inches of brick and an inch and a half of plaster. It would indeed have been difficult to hear through such a wall.[20] As has been stated, an objection was offered by the defense to the admission of Jones' testimony on this point. The law member rules, "If the witness was asked whether this [thickness of the walls] follows the usual customary construction, I think his evidence would be admissible on that." The trial judge advocate then asked the witness, "The construction of this four-family brick apartment. Does that follow the usual custom and have the customary thickness of the walls?" The witness answered, "Yes, sir. It is the same as all the houses in Corby." Jones had not measured the parti-

---

[18] The pertinent portion of Paragraph 41.d. is as follows: "While his [the trial judge advocate's] primary duty is to prosecute, any act (such as the conscious suppression of evidence favorable to the defense) inconsistent with a genuine desire to have the whole truth revealed is prohibited."

[19] It is true that the rule as to suppression of evidence has generally operated against the accused and that such suppression has been required to have been conscious. See Wigmore on Evidence, §§ 278–280. I have been able to find no case in point where the suppression of evidence, conscious or otherwise, has been applied in favor of an accused criminal defendant. An analogy is supplied, however, by such cases as Lloyd Sabaudo Societa v. Elting, 287 U.S. 329, 339, 53 S.Ct. 167, 77 L.Ed. 341; Kwock Jan Fat v. White, 253 U.S. 454, 40 S.Ct. 566, 64 L.Ed. 1010; Lewis ex rel. Lai Thuey Lem v. Johnson, 1 Cir., 16 F.2d 180. In the case first cited Mr. Justice Stone stated [287 U.S. 329, 53 S.Ct. 172], "Suppression of evidence or its concealment from a party whose rights are being determined by the administrative tribunal has been held to be so unfair as to invalidate the administrative proceeding." The administrative tribunal referred to was the Secretary of Labor. In the Kwock Jan Fat case and in the Lewis case applications were made for habeas corpus by aliens seeking to avoid deportation.

[20] The testimony of the police constable was illustrated by a chalk drawing on a blackboard. It is difficult to make out the arrangement of the rooms in the Murray home from the evidence. The undisputed testimony of Constable Jones shows that there were four rooms in the Murray house, two upstairs and two downstairs. It also appears from the testimony that the bedrooms were upstairs and that there was a kitchen and a living room downstairs; that the back door through which Hicks entered was at the back of the kitchen and that the front door was the front of the living room. The rooms were probably in line. Constable Jones testified that the rooms were about twelve feet by twelve feet. There is a permissible inference therefore that Hicks and Mrs. Murray at the time of the offense were not more than a few feet away from the partitions dividing the Murray home from that of the Smedleys or the Smiths.

Compare the testimony of Mr. and Mrs. Green that when these witnesses returned with Mrs. Murray to the Murray home Hicks was standing between the dining room and the scullery.

tions and his statement that all the houses in Corby had the same thickness and construction of wall, is incredible. Corby is a village of over 2,000 inhabitants and the court-martial could have taken judicial notice that the walls of all the houses in Corby could not be the same. It appears that the partitions between the Murray home and the homes of the Smedleys and the Smiths differed in thicknesses. It is almost unbelievable that a court trying a man for his life should have received Jones' testimony as to the thickness of walls based as it was on pure supposition. The receipt of this evidence was highly prejudicial and constituted reversible error.

■ (7) In a court-martial, as in a criminal proceeding before a civil court, the guilt of the accused must be proved beyond a reasonable doubt. That this cardinal principle of criminal jurisprudence is applicable to court-martial proceedings is demonstrated by the provisions of Paragraph 78.a. of the Courts-Martial Manual.[21] Hicks was tried on February 4, 1944, and was sentenced the following day. Five days later, viz., on February 10th, the president of the court-martial wrote a letter to the Commanding General of the Eighth Air Force, requesting clemency for Hicks " * * * due to extenuating circumstances presented in the evidence * * *" stating, "It is obvious that Private Donald * * * Hicks, * * * did have sexual intercourse with Mrs. Murray against her will but there is doubt in the mind of the Court that Mrs. Murray did take all normal precautions necessary to avoid the act, viz: she did not scream loud enough to be heard in the adjoining apartment, whereas if she had done so, testimony by the occupants of the adjoining apartments, viz: Mr. and Mrs. Smedley and Mr. and Mrs. Smith, showed that normal noises from the Murray apartment could be heard."

■ If the members of the court-martial believed that Mrs. Murray did not take the "normal precautions necessary" to avoid rape and that even "normal noises" from the Murray apartment could be heard by the Smedleys and the Smiths, it is scarcely conceivable that five days earlier they could have believed Hicks to have been guilty beyond a reasonable doubt of the crime of having carnal knowledge of Mrs. Murray forcibly and against her will. For this reason I entertain grave doubt as to whether or not the provisions of Paragraph 78. of the Courts-Martial Manual were observed by the court-martial but since it is not appropriate in the proceeding at bar to go behind the express finding of the court-martial that Hicks was "guilty" of the specification and the charge I shall not dilate on this point further.[22]

### Errors of Reviewing Authorities.

■ The verdict of the court-martial and all of the proceedings were reviewed by the trial judge advocate, by the staff judge advocate[23] and by the Judge Advocate General's Office. These reviews were inadequate. None of the substantial errors in the court-martial proceedings was noted as prejudicial error by the reviewing authorities. Indeed only one such error is mentioned, viz., the testimony of Corporal Strayel to the effect that he "could give accused assistance if he would make a statement."[24] The receipt of Strayel's testimony was not deemed to be reversible

---

21 The section states: "In order to convict of an offense the court must be satisfied beyond a reasonable doubt, that the accused is guilty thereof."

22 A very considerable portion of the argument of the petitioner's counsel in the instant proceeding is directed to the contention that since Hicks was charged with a crime punishable with death it was necessary that all members of the court-martial concur in the finding of "guilty". This contention is without merit. It is unnecessary, however, to deal with it at length since the questions of law presented are disposed of by the opinion of the Circuit Court of Appeals for the Fourth Circuit in Stout v. Hancock, 4 Cir., 146 F.2d 741, reversing Hancock v. Stout, D.C., 55 F.Supp. 330.

23 The review was actually made by an assistant staff judge advocate but the staff judge advocate concurred in the findings made by this officer.

24 The whole of the reviewing officer's comment as to Strayel's conduct and testimony is as follows:

"Testimony of Corporal John P. Strayel, 985th Military Police Company, Investigating Division, reveals that this non-commissioned officer interrogated accused during the preliminary investigation without first warning accused of his rights, and indicates that he probably told accused that any statements he made could not be used against him and that he, Corporal Strayel, could give accused assistance if he would make a statement. This investigator revealed a highly im-

error and the reviewing staff judge advocate specifically found that. "The record is legally sufficient to support the findings and sentence." No error in the proceedings before trial was commented upon. or even noted by the reviewing authorities.

Article 37 of the Articles of War, 10 U.S.C.A. § 1508, and paragraph 87.b. of the Courts-Martial Manual vest a sound legal discretion in the reviewing authority to the end that substantial justice may be done. In Hicks' case the failure of the reviewing authority to order a new trial was an abuse of legal discretion.

### Law.

■■■■ The Circuit Court of Appeals for this Circuit in United States v. Hiatt, 3 Cir., 141 F.2d 664, 666, held that the basic guarantee of fairness afforded by the due process clause of the Fifth Amendment applies to a defendant in criminal proceedings in a federal military court as well as in a federal civil court and that an " * * * individual does not cease to be a person within the protection of the fifth amendment of the Constitution because he has joined the nation's armed forces and has taken the oath to support that Constitution with his life, if need be." The court went on to state: "This is not to say that members of the military forces are entitled to the procedure guaranteed by the Constitution to defendants in the civil courts. As to them due process of law means the application of the procedure of the military law. Many of the procedural safeguards which have always been observed for the benefit of defendants in the civil courts are not granted by the

military law. In this respect the military law provides its own distinctive procedure to which the members of the armed forces must submit. But the due process clause guarantees to them that this military procedure will be applied to them in a fundamentally fair way. We conclude that it is open for a civil court in a habeas corpus proceeding * * * and the manner in which it was conducted ran afoul of the basic standard of fairness which is involved in the constitutional concept of due process of law and, if it so finds, to declare that the relator has been deprived of his liberty in violation of the fifth amendment and to discharge him from custody."

### Respecting the Effect of Errors in the Proceedings before Trial.

■■■■ The respondent contends that there was no error in the procedure before trial but if there was it is not proper subject matter for inquiry in a habeas corpus proceeding. The respondent's position in this regard is stated in his brief as follows: "Such preliminary investigation resulting in actual filing of a charge of violation of an Article of War is not the 'criminal prosecution' itself.", citing, inter alia, Romero v. Squier, 9 Cir., 133 F.2d 528, certiorari denied sub nom. Romero v. Squire, 318 U.S. 785, 63 S.Ct. 982, 87 L.Ed. 1152; Young v. Sanford, 5 Cir., 147 F.2d 1007, and Burall v. Johnston, 9 Cir., 146 F.2d 230.[25] Conceding that the pretrial procedure, whether in a criminal proceeding before a civil court or before a court-martial is not the criminal prosecution itself, it must be admitted that irregularities in pretrial procedure may invalidate a judgment even in a civil court

---

proper view of his function and a lack of knowledge of his duties. This condition has been discussed with the staff provost marshal of this command, who has now advised that Corporal Strayel's immediate commanding officer has instructed the corporal and is conducting a refresher course in investigating methods for his organization."

[25] The cases cited are not helpful. For example, in the Romero case the issue was whether certain evidence admitted in evidence at the court-martial was procured by an illegal search and seizure in violation of the Fourth Amendment. The court held that since there was no violation of the Fourth Amendment it was not required to decide whether the court-martial had jurisdiction to render a judgment of conviction based upon evidence

procured by an illegal search and seizure. The decision in the Young case is not in point save by remote analogy for the petitioner for the writ of habeas corpus had been convicted in a civil court. The same observation is pertinent in respect to the Burall case.

Other authorities cited by the respondent upon this point are not more helpful. See In the Matter of Moran, 203 U.S. 96, 27 S.Ct. 25, 51 L.Ed. 105; Harlan v. McGourin, 218 U.S. 442, 31 S. Ct. 44, 54 L.Ed. 1101, 21 Ann.Cas. 849; Ex parte Wilson, 140 U.S. 575, 11 S.Ct. 870, 35 L.Ed. 513; Baker v. Hudspeth, 10 Cir., 129 F.2d 779; Sandford v. United States, D.C., 55 F.Supp. 146; United States v. Hiatt, D.C., 33 F.Supp. 1022, and Snedeker v. United States, D.C., 54 F.Supp. 539.

of criminal jurisdiction. See McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819. Cf. United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140 and Malinski v. People of State of New York, 324 U.S. 401, 65 S.Ct. 781.

 While one of the purposes of the prescribed pretrial procedures is to determine whether charges shall be brought against a member of the armies of the United States, a primary purpose is to enable the accused to prepare his defense. The soldier cannot avail himself of the means of procuring witnesses and pertinent testimony so readily available to a civilian defendant. Under such circumstances the employment of the investigative techniques prescribed by the Articles of War and the Courts-Martial Manual is essential if the accused soldier is to enjoy a fair trial. See United States v. Hiatt, supra, and compare Reaves v. Ainsworth, 219 U.S. 296, 31 S.Ct. 230, 55 L.Ed. 225. The failure to employ these required investigative techniques was the primary reason why evidence of the complaining witness's reputation for chastity never reached the court-martial at Hicks' trial. An available body of substantial and pertinent evidence on the only real issue of fact presented, viz., whether Hicks had compelled the complaining witness to have sexual intercourse with him without her consent, was not investigated. For this reason the petitioner was unable to prepare properly his defense. The petitioner was not given the benefit of the procedure of the military law in this regard. This was a denial of due process of law to him. I shall not discuss in detail the effect of other errors in the proceedings before trial.

### Respecting the Effect of Errors at the Court-Martial.

 There were numerous errors committed at the court-martial. Of these "(1)," and "(2)" and "(4)", under the heading "Errors in the Court-Martial Proceedings", occurring in a criminal trial before a civil tribunal would each have constituted a denial of due process of law and a violation of the Fifth Amendment. The military procedure, as has been pointed out,

afforded equivalent rights to Hicks. This procedure was breached and Hicks was denied due process of law thereby.

 The court-martial did not receive evidence as to the complaining witness's reputation for chastity in her community. Such evidence was available and its existence must be presumed to have been known to the trial judge advocate for the report of the investigating officer was in his hands. Evidence as to Mrs. Murray's reputation for chastity was necessary "for a proper determination" of the matter before the court-martial. The military procedure required this evidence to be produced before and to be received by the court-martial.[26] This procedure was breached and thereby Hicks was denied due process of law.

While the matter just discussed may appear to lie in the evidentiary field and for that reason may seem to be beyond any question of denial of due process, such a view will not stand scrutiny. Here, as was also the case in respect to the insufficiency of the investigation referred to under the previous heading, the failure to observe the military procedure amounted to a denial of evidence to the accused. I conceive that it is not an answer to this statement to point out that no one intended to deny the petitioner a fair trial and that, perhaps if witnesses as to Mrs. Murray's reputation for chastity had come forward their evidence would have been received. Such witnesses were not "available" to the petitioner because the military procedure was not observed and for that reason the petitioner was deprived of his rights.

I shall not discuss in detail the effect of the other errors in the court-martial proceedings.

### Respecting the Totality of Errors.

 Casting up all of the errors committed, hereinbefore referred to under the first three headings of this opinion, by reason of failure to observe the provisions of the Articles of War and the Courts-Martial Manual whether in the pretrial procedure, at trial and on review,[27] I conclude that these were so

---

[26] The failure to receive this evidence may have resulted in the verdict of guilty or may account for the severity of the sentence imposed upon the petitioner.

[27] It has of course been long settled that the writ of habeas corpus will not lie in a federal civil court, as distinguished from a federal military court, in

numerous and of such effect as to deprive Hicks of the substance of a fair trial. The procedures of the military law were not applied to Hicks in a fundamentally fair way.

The petitioner's conduct, however viewed, was such as to bring discredit and disgrace upon the armed forces of the United States. This fact may not be taken into consideration since the judgment of this court must be in accordance with law.

The motion made by the respondent to strike out exhibits offered by the petitioner will be denied. This court has made no use of the exhibits offered for the purposes of the decision except the "Record of Trial by General Court-Martial" but concludes that all of the exhibits should remain in the record for the benefit of the reviewing courts.

The petitioner will be discharged from custody. An order to such effect will be entered.[28]

---

lieu of an appeal and it may be contended that every error in procedure or in substance set out in this opinion might have been reached by the reviewing authority of the "Record of Trial of General Court-Martial" as distinguished from the actual proceedings at the trial by court-martial be deemed to be the record of the proceedings against Hicks. I conclude, as has been indicated in this opinion, that the "Record of Trial by General Court-Martial" is the record of the proceedings against Hicks but the conclusion does not follow that a judgment of conviction by a court-martial may not be set aside by writ of habeas corpus for errors which appear in the record.

It must be borne in mind that courts-martial are not part of the federal judicial system. Altmayer v. Sanford, 5 Cir., 148 F.2d 161, 162. A court-martial is a court of limited jurisdiction, whose judgment may be questioned collaterally. See the statement of Mr. Chief Justice Marshall in Ex parte Watkins, 3 Pet. 193, 209, 7 L.Ed. 650. Cf. Dynes v. Hoover, 20 How. 65, 81, 15 L.Ed. 838; Runkle v. United States, 122 U.S. 543, 555, 7 S.Ct. 1141, 30 L.Ed. 1167; and McClaughry v. Deming, 186 U.S. 49, 63, 22 S.Ct. 786, 46 L.Ed. 1049. It follows that if due process of law has not been afforded an accused soldier by application of the procedure of military law, the accused may be set at liberty by the writ despite the fact that the errors in procedure or substance should have required the reviewing authority to have granted a new trial.

[28] The following order was entered in this cause: "And Now, to wit January 24th, 1946, an opinion having heretofore been filed on January 15, 1946 in this cause, which provided 'The petitioner will be discharged from custody. An order to such effect will be entered.', and it now appearing that the Restoration Section of the Correction Division of the War Department, acting on a review of the Donald Hicks court-martial proceeding had prior thereto on January 11, 1946 issued what is commonly designated a 'Blue Seal' order vacating the original court-martial sentence and restoring the said Donald Hicks to duty, and there having been submitted a Certificate of the Warden which is directed to be filed herewith, showing that pursuant to said War Department order the petitioner has been released from custody at the United States Penitentiary, Lewisburg, Pennsylvania, and was assigned to the Reception Center Indiantown Gap Military Reservation, Pennsylvania, with a view to eventual assignment to a unit in accordance with his qualifications;

"It is Accordingly Ordered and Decreed that the proceedings in habeas corpus be and the same are hereby dismissed as moot."