## BECKER v. WEBSTER.

No. 125, Docket 21187.

United States Court of Appeals
Second Circuit.

Jan. 4, 1949.

Edward A. Lipton, of New York City, for appellant.

John F. X. McGohey, U. S. Atty., and John F. Ryan, both of New York City, for appellee.

Before L. HAND, Chief Judge, and CHASE and FRANK, Circuit Judges.

L. HAND, Chief Judge.

This is an appeal from an order discharging a writ of habeas corpus granted to review the conviction of the relator by a general court-martial. The respondent, General Webster, filed a return to the writ, and the judge heard the case upon the record of the trial before the court-martial at Wies-baden, Germany, in March, 1948. The conviction was upon three charges: (1) Selling whisky to soldiers; (2) causing "travel orders to be falsely made" by which enlisted men were authorized to go to Holland to get the whisky; (3) uttering the same forged "travel orders." The only question raised upon the appeal is whether Becker was denied the rights secured to him by the Seventieth Article of War, 10 U.S.C.A. § 1542, and § 35(a) the "Manual of Courts-Martial." Orginally only the first two of the three charges were filed, of which an officer, named Adcock, was detailed to conduct the investigation as the Seventieth Article requires. In the course of this he tried to take the testimony of one, Ilse Dieringer, a German who had been Becker's secretary. This examination was conducted in Becker's presence, and Becker tried to cross-examine her; but both upon the direct and upon the cross she refused to answer all but a few unimportant questions. Nevertheless, Adcock found in other evidence enough support for the two charges to recommend to his superior officer that a general court-martial be convened. That officer transmitted Adcock's report and the testimony to the Staff Judge Advocate, who, although he reported back that there appeared to be enough proof to sustain the two charges, for good measure recommended that the third charge be added; and that was also referred to Adcock for investigation. Thereafter Adcock telephoned to the manager of the "PX store," where Ilse Dieringer worked, told him that in a few days he would question her again, and "asked him if he couldn't put her at ease so that she would be able to talk sensibly, or put her at ease when he questioned her," and the manager told him "that he would try." Apparently he succeeded, because, when Adcock examined her the second time—this time in the absence of Becker and his lawyer—she made a full disclosure of what she knew regarding the preparation and use of the "travel orders." The last part of her examination was as follows:

"Q. What made you decide to tell the truth now and why didn't you tell me the truth the first time I talked to you? A. Because I thought I wouldn't have to go to

a court-martial and wouldn't have to testify against any American. Maybe you don't see the way I feel, it is hard to make myself understood.

"Q. I think I know how you feel, Susie. I don't have any more questions, is there anything more you would like to say, Susie? A. Maybe you don't believe me any more because I wouldn't tell the truth in the first place, but today I told you really what I know about it, everything I can remember so far. If you want to ask me again in front of Lt. Becker, its O.K. I see that I must have been—I don't know what it was."

Before the second examination Adcock had told Chase, Becker's lawyer, that he proposed to examine Ilse in Becker's absence; and to this Chase had objected, because that would not comply with the Seventieth Article. Adcock disregarded this protest, but before reporting upon the third charge, he offered to show the testimony to Chase, and told him that, if he wished, he might call the witness and cross-examine her in Becker's presence. Chase refused on the ground that cross-examination would be useless after the direct had been taken in Becker's absence. Adcock then recommended that a general court-martial should be convened to try the third charge as well as the first two, and the trial proceeded on all three.

■ A trial before a general court-martial, convened without any preliminary investigation under the Seventieth Article, would of course be altogether irregular; but the court might nevertheless have jurisdiction. Certainly such a trial would not deny to the accused "due process of law" in the broad sense that that phrase is sometimes used: i. e., that he must be fully advised of the evidence used against him; that he must have opportunity to cross-examine and answer; that he must have assistance of counsel; and that judges must be without bias or commitment. The preliminary investigation is a creature of statute, which Congress need not have provided at all; for the Fifth Amendment expressly exempts courts-martial from the necessity of indictment.[1] Indeed, in any criminal prosecution a bare information satisfies the Fourteenth Amendment.[2] The effect of irregularities in the conduct of the investigation has been considered in numerous cases;[3] but in Smith v. Hiatt, supra,[3] alone has any court of appeals made the result depend upon whether there was substantial compliance with the article; for, although in Benjamin v. Hunter, supra,[3] the court said that compliance was necessary, the decision did not demand it. Nevertheless, we shall assume for argument that Smith v. Hiatt, supra,[3] was right, without committing ourselves, should the question recur.

■ This we may do, because, there was not only "substantial compliance" with the article; but literal compliance as well. The text contains nothing about "confrontation" on the direct; and the omission is most significant, because of the express grant of the right to cross-examine: "at the investigation full opportunity shall be given to the accused to cross-examine witnesses against him if they are available." It is at the outset to be observed that even this right is not absolute, for "availability" admits of much latitude of interpretation.[4] But even if it had been absolute, it would not have implied the right of "confrontation" upon the direct in cases where the accused has had access to the direct testimony before he is called upon to cross-examine. Indeed, "the main and essential purpose of confrontation is to secure for the opponent the opportunity for cross-examination. * * * That this is the true and essential significance of confronta-

---

[1] Ex parte Quirin, 317 U.S. 1, 39, 63 S.Ct. 2, 87 L.Ed. 3.

[2] Hurtado v. California, 110 U.S. 516, 4 S.Ct. 111, 292, 28 L.Ed. 232; Gaines v. Washington, 277 U.S. 81, 48 S.Ct. 468, 72 L.Ed. 793; Adamson v. California, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223.

[3] Reilly v. Pescor, 8 Cir., 156 F.2d 632; Waite v. Overlade, 7 Cir., 164 F.2d 722; Hironimus v. Durant, 4 Cir., 168 F.2d 288; Benjamin v. Hunter, 10 Cir., 169 F.2d 512; Smith v. Hiatt, 3 Cir., 170 F.2d 61; De War v. Hunter, 10 Cir., 170 F.2d 993; Henry v. Hodges, 2 Cir., 171 F.2d 401.

[4] De War v. Hunter, 10 Cir., 170 F.2d 993.

tion is clear from the language of counsel and judges from the beginning of the Hearsay rule to the present day." [5] It is true that there is "a secondary advantage to be obtained by the personal appearance of the witness"; but that is in order that the tribunal shall be able to observe his "deportment while testifying," and by that "a certain subjective moral effect is produced upon the witness" also. Any such advantage will be secured, however, if the direct is before the tribunal, because it "does not arise from the confrontation of the opponent and the witness; it is not the consequence of the two being brought face to face." [6] Perhaps this is not a complete account of all the interests at stake. It is at least theoretically possible that at the outset of his cross-examination an "opponent" who has not been present on the direct may be at some disadvantage even though he has had access to the direct; but that is a handicap which will soon disappear as the demeanor of the witness develops, and certainly it is not enough to justify the interpolation into this statute of an apparently deliberate omission.

Moreover, this prima facie interpretation is borne out by administrative interpretation. The "Manual for Courts-Martial" is a publication, promulgated by the President under the authority of the Thirty-Eighth Article of War, 10 U.S.C.A. § 1509. Section 35(a) deals with investigations under the Seventieth Article, and concludes with "Instructions" for their conduct. The only part here relevant is that "all available witnesses who appear to be reasonably necessary for a thorough and impartial investigation, will be called and examined in the presence of the accused. * * * Where the investigating officer makes known to the accused the substance of the testimony expected from a witness as ascertained by written statement of the witness, interview with the witness, or other similar means, and the accused states that he does not desire to cross-examine such witness, the witness need not be called even if available." This gloss is in perfect accord with the text, and makes it read as we should have read it independently.

Adcock followed it literally and in so doing gave to Becker the full measure of his rights.

Certainly there was no basis for the reason which Chase gave for refusing Adcock's proposal that he cross-examine the witness. He did not suggest that Adcock's mind had been more impressed by Ilse Dieringer's testimony because it had been taken in Becker's absence than if Becker had been present:—that would have been absurd. His reason was that she would yield less readily to cross-examination than if her direct had been given in his, or Becker's, presence. If that is a good ground, it forbids reducing any witness's testimony to written form in advance of a trial, or indeed even examining him orally. Nothing would then be permissible except that all parties must put their witnesses on the stand, as tabulae rasae; and the custom—universal so far as it is practicable—of interviewing one's witnesses before trial and reducing their proposed testimony to writing would become unprofessional. To such fantastic extremes can the pursuit of legal will-o-the-wisps be pushed.

Finally, there is as little substance to the undeserved slur, based upon Adcock's letter to the "PX manager," asking that he put Ilse Dieringer "at ease so that she would be able to talk sensibly"; and the manager's answer. The intimation (perhaps it is an imputation) from this is apparently that Adcock was asking the manager to put pressure upon her to support the prosecution. That is an utterly unfair interpretation. Upon her first examination the witness had not favored Becker or evinced any bias against the prosecution; for practical purposes she had stood mute. That, as she said on her second examination, was because she had been afraid of what might befall her, if she aroused the resentment of an American officer. Apparently Adcock had already inferred as much from her first examination; and it was part of his duty to search out the truth, to try to allay her fears, and to make her "talk sensibly," which she had not done. So far as the record dis-

---

[5] Wigmore, § 1395 (1).

[6] Wigmore, § 1395 (2).

closes, throughout the investigation Becker was not only given the full benefit of the Seventieth Article, but was treated with entire impartiality.

Order affirmed.

FRANK, Circuit Judge (dissenting).

The Manual is more than a gloss on, or an administrative interpretation of, the statute. For it was promulgated pursuant to Article 38 of the Articles of War, 10 U.S.C.A. § 1509, which authorizes the President, by regulation, to prescribe the procedure of courts-martial, provided his regulations are not "contrary to or inconsistent with" the Articles. Thus the President may add to (but not subtract from) the statutory requirements. What he adds has the force of a statute.

Article 70 of the statute, 10 U.S.C.A. § 1542, provides, "No charge will be referred to a general court martial for trial until after a thorough and impartial investigation thereof shall have been made. * * * At such investigation full opportunity shall be given to the accused to cross-examine witnesses against him if they are available. * * * If the charges are forwarded after such investigation, they shall be accompanied by a statement of the substance of the testimony taken on both sides." [1]

It is arguable that "cross-examine" means the right to be present at the direct examination. But I shall assume, arguendo, that it does not. For the Manual specifically provides that, at such investigation, each witness "will be called and examined in the presence of the accused." Thus we have a positive legal requirement, fully as obligatory as if it were in the statute, that, in the formal investigation which is made a condition precedent of any trial, each witness must be "examined in the presence of the accused."

It is not difficult to understand the reason why the Manual requires that the accused should be present at the examination of all the witnesses: The formal "investigation" is the equivalent of that preliminary hearing, before a magistrate. in a criminal proceeding, required in England and in some of our states, where an information is substituted for an indictment in the case of major crimes. See Orfield, Criminal Procedure from Arrest to Appeal (1947) 82–83; § 46 A.L.I. Code of Criminal Procedure; Kenny, Outlines of Criminal Law (15 Ed.1936) 533. Because in such a case there is no indictment, so that the examination before the magistrate is the sole investigation undertaken to ascertain whether there is enough evidence against the defendant to justify his being tried, "the defendant," says Orfield, "has a right to be present at the preliminary hearing," and this calls for "both confrontation and cross-examination * * * [2] It is not enough that the defendant has such rights at the [subsequent] trial since one of the objects of the preliminary examination is to determine whether there is a case against the defendant which will stand up

---

[1] In its entirety, the pertinent portion of the statute reads:

"10 U.S.C.A. § 1542. Charges; action upon (article 70)

"Charges and specifications must be signed by a person subject to military law, and under oath either that he has personal knowledge of, or has investigated, the matters set forth therein, and that the same are true in fact, to the best of his knowledge and belief. No charge will be referred to a general court martial for trial until after a thorough and impartial investigation thereof shall have been made. This investigation will include inquiries as to the truth of the matter set forth in said charges, form of charges, and what disposition of the case should be made in the interest of justice and discipline. At such investigation full opportunity shall be given to the accused to cross-examine witnesses against him if they are available and to present anything he may desire in his own behalf either in defense or mitigation, and the investigating officer shall examine available witnesses requested by the accused. If the charges are forwarded after such investigation, they shall be accompanied by a statement of the substance of the testimony taken on both sides."

[2] See State v. McLain, 13 N.D. 368, 102 N.W. 407, 408.

See Comments (p. 287 ff.) on § 46 of the A. L. I. Code which show the numerous state statutes requiring that, in the preliminary examination, all witnesses shall be both examined and cross-examined "in the presence of the accused."

at the trial."[3]  In England, says Kenny, "at these preliminary inquiries the presence of the accused is absolutely essential. The preliminary examination is conducted as follows: The prosecutor 'opens his case' by any necessary explanation. Then his witnesses are examined in chief, cross-examined and re-examined. * * *"

In Rex v. Phillips, 31 Cox C. C. 146 (1938), the English Court of Criminal Appeals held that a conviction of the defendant Phillips must be quashed because of violation of § 17 of the Indictable Offense Act, 1848, which reads: "In all cases where any person shall appear or be brought before any justice or justices of the peace charged with any indictable offence * * * such justice or justices, before he or they shall commit such accused person to prison for trial, or before he or they shall admit him to bail, shall, *in the presence of such accused person,* who shall be at liberty to put questions to any witness produced against him, take the statement on oath or affirmation of those who shall know the facts and circumstances of the case, and shall put the same into writing, and such depositions shall be read over to and signed respectively by the witnesses who shall have been so examined, and shall be signed also by the justice or justices taking the same. * * *"[4]

The Court said: "The facts as to the procedure adopted by the committing justices were not in dispute.  Quayle was brought before the justices in December, 1937, and proceedings were continued against him alone until the 28th March, 1938, when Phillips was brought before the justices as a co-defendant with Quayle. Meanwhile thirty-five witnesses had been called and examined.  Their evidence had been taken in a regular manner, in the presence of Quayle.  When Phillips was brought before the court, it became necessary to recall those thirty-five witnesses in order that they might repeat their evidence, which incriminated Phillips as well as Quayle.  The evidence of those thirty-five witnesses related to the charges which were subsequently embodied in counts 1 to 7 (inclusive).  Instead of examining each witness anew in the presence of Phillips, the justices took a course which it was thought would result in a saving of time.  Each witness's deposition was read over to him and he was then asked whether it was correct.  The answer was always in the affirmative so that there appeared at the end of each witness's deposition the signed statement: 'My deposition has been read over to me and it is correct.'  The appellant Phillips was then given the opportunity, such as it was, of cross-examining the witness whose evidence he had heard given in that summary and compendious form.  We have no doubt that this procedure, however convenient it may have seemed to be, was irregular and contrary to law. * * *  The terms of sect. 17 of the Indictable Offences Act, 1948, are imperative, and if they are complied with the accused person hears the witness give his evidence, so that he is able to object to any question that may be put improperly and to see that the oral evidence is recorded in writing with accuracy and fairness. * * *  It was said at the Bar that the practice which was adopted by the magistrates in the present case is common, if not general.  We cannot, however, regard this fact, if fact it be, as a reason for approving or condoning an irregularity which well may be prejudicial to an ac-

---

[3] See Thies v. State, 178 Wis. 98, 189 N.W. 539, 541: "Since the adoption of the amendment of 1870, a presentment or an indictment by a grand jury has been the exceptional proceeding and by far the greater number of prosecutions in cases of felony have been by information rather than by indictment.  The object or purpose of the preliminary investigation is to prevent hasty, malicious, improvident, and oppressive prosecutions, to protect the person charged from open and public accusations of crime, to avoid both for the defendant and the public the expense of a public trial, and to save the defendant from the humiliation and anxiety involved in public prosecution, and to discover whether or not there are substantial grounds upon which a prosecution may be based."

[4] Emphasis added.

In Rex v. Gee, 30 Cox C. C. 432, 436, the court noted that since 1933 (under the Administration of Justice Act, 1933) "a committal by magistrates is substituted for presentment by the grand jury. * * *"

cused person. In the circumstances we think it right that the conviction of Phillips on counts 1 to 7 should be quashed."

I think we should hold similarly here, For I think the deviation from the requirement of the Manual was so substantial as to deprive the court-martial of jurisdiction. See Smith v. Hiatt, 3 Cir., 170 F.2d 61; Hicks v. Hiatt, D.C., 64 F.Supp. 238.

My colleagues suggest that to apply here the reasoning of the English court in Rex v. Phillips, supra—i. e., to require the presence of the accused not only at the cross-examination, but during the direct examination, of each witness in the preliminary examination—would have an absurd result since, my colleagues say, it would forbid "reducing any witness' testimony to written form in advance of trial, or indeed even examining him orally." Clearly no such result follows: Thus in Rex v. Phillips, supra, the court cited and relied upon the earlier case of Rex v. Gee, 30 Cox C. C. 432; there the court quashed convictions for an irregularity in the preliminary hearing before the committing magistrates, but said that it was proper for the Chief Constable, previous to that preliminary hearing, to interview the witnesses and to take statements from them. Of course the defendant here could not have complained had the investigating officer interviewed the witness or taken a statement from her, provided the officer, at the investigation, had then taken her direct testimony in the presence of the defendant. But here the investigating officer used her direct testimony as the basis of what the statute describes as "a statement of the substance of the testimony" which (so the statute commands) is to accompany the charges," if any "charges are forwarded after" that formal "investigation," without which a court-martial cannot be held. The "statement of the substance of the testimony" so "forwarded" is thus an essential prerequisite of the trial; and that testimony must not, under the Manual, consist of the testimony of a witness who has testified in the absence of the accused.[5]

[5] Appellee advances an argument to which my colleagues apparently give no weight, since they do not mention it. This argument rests on the fact that the provision in the Manual requiring the presence of the accused is preceded by the following language: "What follows in this Paragraph (35a.) is primarily intended to indicate a proper procedure in the more usual cases. Variations to save labor, time, or expense, or designed to meet other cases, or exceptional or local conditions, or for any other good reason, are not only permissible but should be adopted, providing the spirit and purpose of the statutory requirements quoted above are carried out." Appellee contends that the investigating officer properly decided that (I quote appellee's brief) "the refusal of the witness 'Susie' to make her statement in the presence of the accused" created an "unusual" case which gave that officer the power to take her testimony in the defendant's absence. Surely that contention is untenable. It would mean that any case would be "unusual" where the presence of the accused might deter a witness from testifying. It would thus destroy the reason for the requirement.